UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re DRDGOLD LTD. SECURITIES LITIGATION. ---------------------------------- This document relates to all actions. | 05 Civ. 5542 (VM) **DECISION AND ORDER** |
| --- | --- |

**VICTOR MARRERO, United States District Judge.**

This consolidated[1] class action was brought against defendants DRDGOLD Limited ("DRD"), the chairman of DRD's board of directors, Mark Wellesley-Wood ("Wellesley-Wood"), and its CEO-CFO, Ian Louis Murray ("Murray")(collectively, "Defendants"), by various individual plaintiffs (collectively "Plaintiffs") on behalf of all investors who purchased or otherwise acquired the securities of DRD between October 23, 2003 and February 24, 2005 (the "Class Period"). The consolidated amended class action complaint, dated February 27, 2006 ("CAC"), alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a et seq. Defendant DRD now moves to dismiss the CAC pursuant to Fed. Rules of Civ. P. 9(b) and 12(b)(6). For the reasons set forth below, DRD's motion is GRANTED.

---

[1] By order of this Court, dated August 8, 2005, five separate actions, asserting the same or substantially similar allegations, were consolidated.

## I.   __BACKGROUND__[2]

A.   __DRD's OPERATIONS__

DRD is a gold exploration and mining company which operates mines in South Africa and Australasia (Australia and certain neighboring islands); it is a public company incorporated under the laws of South Africa and its American Depository Shares are traded on the NASDAQ.  DRD's North West Operations in South Africa ("NWO"), which accounted for a significant part of DRD's business,[3] was experiencing financial problems prior to the start of the Class Period.

At the start of the Class Period, DRD announced that it was undertaking a major restructuring of its NWO in order to return it to profitability.[4]  Throughout the Class Period, updates on the progress made at the NWO were optimistic.  A January 24, 2004 press release announcing DRD's financial results for the previous quarter noted that while production at the NWO was lower, the restructuring "had delivered the anticipated results in terms of gold production, grade and costs . . . ." (CAC ¶ 71.)  DRD even reported a return to

---

[2]  The recitation of facts below is drawn from the CAC, unless otherwise noted, and no further references will be made to this document except where quoted or otherwise specifically cited.

[3]  Gold production at the NWO "accounted for approximately 90% of [DRD's] total gold production in fiscal year 2003 and 77% in fiscal year 2002." (CAC ¶ 30 (quoting DRD's Form 20-F filed with SEC on Dec. 30, 2003).)

[4]  "The purpose of the [NWO] restructure is to return the mine to profit and to restore a meaningful margin to shareholders." (CAC ¶ 60 (quoting DRD's Form 6K filed with SEC on Oct. 31, 2003).)

profitability for the NWO for the quarter ending March 31, 2004.  The report for the following quarter, ending June 30, 2004, noted that "DRD's [NWO] continued to stabilize following September 2003's restructuring . . . ." (Id. ¶ 81.)

However, DRD was unable to sustain the NWO at a profit. A press release announcing DRD's financial results for the period ending December 31, 2004 noted that "[p]roduction from the [NWO] was slightly lower, reflecting the impact of various infrastructural constraints.  These are being addressed." (Id. ¶ 87.)  Ultimately, the restructuring failed, and in February of 2005 DRD acknowledged that it would have to take a total impairment on the NWO.  As stated in a February 24, 2005 press release announcing DRD's interim financial statements for the six months ending December 31, 2004, the "ongoing poor performance of the [NWO] in the low Rand environment has necessitated a full impairment of the mining assets amount to R214 million resulting in our net loss increasing to R370.1 million for the six months ended 31 December 2004." (Id. ¶ 100.)

B.   THE PARTICULARS OF THE FRAUD ALLEGED

    1.   Knowledge of Failed Restructuring

    Plaintiffs alleges that Defendants knew or recklessly disregarded that due to high fixed costs, the restructuring of the NWO "was doomed to fail from the start." (Id. ¶ 3.)

According to Plaintiffs, "[r]ather than admitting that existing union contracts resulting in very high labor costs and the antiquated infrastructure of the NWO made it impossible fo DRD to operate them at any where near break-even, DRD repeatedly insisted that the restructuring was successful." (Id.)

The CAC cites in support of its allegations two confidential witnesses who were DRD insiders during the Class Period.  According to "CW2," DRD was aware that operations "were performing well below expectations and that there were very many undisclosed illegalities which when disclosed would have a marked impact on the DRD share price." (Id. ¶ 11.) Thus, Plaintiffs assert that DRD's repeated references to a "strong" balance sheet were materially false and misleading.

Rather than come clean about the barriers to profitability for the NWO, Plaintiffs allege that DRD misrepresented the state of affairs in order to artificially inflate DRD's stock price.  According to the CAC, DRD's misrepresentations enabled the company to obtain financing on favorable terms and use its artificially inflated stock as currency to acquire additional mine interests outside South Africa.

    2.  <u>DRD'S False and Misleading Financial Reporting</u>

On November 29, 2004, DRD issued a restatement of its

2004 quarterly results.  The restatement acknowledged certain mistakes in DRD's accounting.  The first related to DRD's accounting for its 40 percent interest in Crown Gold Recoveries ("CGR").  DRD advanced money to CGR but did not recognize those losses in the respective quarters they were recorded.  Instead, DRD reported these loans as fully impaired in the fourth quarter of fiscal year 2004.  According to Plaintiffs, this omission resulted in DRD materially overstating its reported interim 2004 operating results.

The November 29, 2004 restatement also acknowledged that DRD mistakenly took an accelerated depreciation on Harties Number 6 Shaft ("Shaft 6") based on its expectation that the shaft would not be utilized.  However, DRD did decide to bring parts of the shaft back into production.  Thus, "depreciation should not have been accelerated in the first quarter and subsequently reversed in the third quarter." (Id. ¶ 119 (quoting Annual Report on Form 20-F, filed with the Securities and Exchange Commission ("SEC") on Nov. 29, 2004).)

Plaintiffs allege that DRD's restatement resulted in net income or losses that were overstated or understated in each of its fiscal 2004 quarter end financial statements by approximately 11 percent, 46 percent, 102 percent and 26 percent respectively. (Id. ¶ 140).

In addition to acknowledging specific accounting errors

5

in the restatement, DRD conceded in its 2004 Form 20-F filed with the SEC, that its "disclosure controls and procedures were not effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed [to the SEC] as a result of material weaknesses in our internal control over financial reporting . . . ." (Id. ¶ 149.)  DRD stated that these "material weaknesses" included: insufficient knowledge and experience among its internal accounting personnel regarding United States Generally Accepted Accounting Principles ("U.S. GAAP") and SEC requirements due to difficulty in finding sufficiently qualified personnel in South Africa; insufficient written policies and procedures regarding U.S. GAAP and SEC disclosure requirements; and insufficient management emphasis in evaluating compliance with U.S. GAAP. (Id.)

    3.   <u>Insider Stock Sales</u>

Plaintiffs also allege that Wellesley-Wood, while serving as the chairman of DRD's board of directors, sold a significant portion of his DRD stock holdings at what he knew to be artificially inflated prices.  Specifically, the CAC alleges that "[o]n or about June 1, 2004, defendant Wellesley-Wood sold 20,000 (or more that 18% of his total holdings) at 2.88/share for $57,656." (Id. ¶ 154.)  Plaintiffs assert that the timing of Wellesley-Wood's stock sale and the large

percentage of his holdings involved are indicative of scienter. Plaintiffs also assert, according to confidential witness CW2, that "[c]ompany insiders sold shares prior to the release of bad news about the Company." (Id.)

## II.  LEGAL STANDARD

An assessment of the sufficiency of a claim of fraud brought under the securities laws implicates a statutory and regulatory framework involving Section 10(b) ("§ 10(b)") of the Exchange Act, Rule 10b-5 ("Rule 10b-5") promulgated thereunder, Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") and the pleading standards required by the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. §§ 77k et seq. Section 10(b) declares it unlawful for any person, directly or indirectly, by the use of any means of interstate commerce, the mails, or national securities exchange "to use or employ . . . any manipulative or deceptive device or contrivance in contravention" of SEC rules and regulations. 15 U.S.C. § 78j(b).

Rule 10b-5, promulgated by the SEC to implement § 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999). Under Rule 10b-5, it is unlawful for any person, directly or indirectly, by the use of any means specified in § 10(b):

7

(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1999).

When allegations of securities fraud are premised on misleading statements, plaintiffs must plead facts demonstrating a violation of § 10(b) and Rule 10b-5(b). To state a claim for relief under these provisions, plaintiffs must allege: "(1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' (5) economic loss, and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (internal citations omitted).

Plaintiffs' pleadings in cases alleging violations of § 10(b) and Rule 10b-5 must also satisfy the heightened pleading standards set forth in Rule 9(b), which requires that "in all averments of fraud or mistake, the circumstances concerning fraud and mistake shall be stated with particularity." Fed.

R. Civ. P. 9(b).  In addition, the passage of the PSLRA in 1995 altered the landscape of securities litigation by, among other things, requiring that plaintiffs alleging securities fraud specify each statement that they contend is misleading and the reason that the statement is misleading, that they particularize pleadings as to scienter in a manner that raises a "strong inference" of fraudulent intent.  See Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified at 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5).  Thus, to survive a motion to dismiss, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004); see also In Re IPO Sec. Litig., 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) ("'particularity' means the who, what, when, where, and how: the first paragraph of any newspaper story.") (internal citations omitted).

## III.  DISCUSSION

A.  MATERIAL MISREPRESENTATIONS

### 1.  The NWO Restructuring

DRD argues that Plaintiffs fail to identify any actionable misstatements concerning the NWO restructuring because DRD's statements at most evidence a failed corporate

9

strategy -- a strategy with risks that DRD expressly revealed. As DRD publicly disclosed and as Plaintiffs concede in the CAC, prior to the Class Period, "DRD had experienced significant financial problems with its [NWO] in South Africa. . . ." (CAC ¶ 2.)  Thus, investors were on notice at the outset that profitability at the NWO was an uphill climb. Throughout the Class Period, DRD's public statements with respect to the restructuring never veer beyond cautious optimism at best.

Generally, DRD's public statements refer to the restructuring efforts as returning the NWO to "sustainability." (Id. ¶ 79.)  While ultimately the NWO was not sustainable, DRD argues in its submissions that investors were well aware of "the plainly disclosed facts and risks concerning DRD's financial operations and conditions -- including among other things, DRD's publicly disclosed history of corporate losses, the quality of its mines and reserves, and its acute vulnerability to the price of gold and international monetary exchange rates." (Reply Memorandum of Law in Further Support of Defendant DRDGOLD Limited's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action, dated Aug. 30, 2006 ("Reply Br."), at 1.)  Indeed, DRD's Form 6K, filed with the SEC at the beginning of the Class Period expressly states that "[p]rospects for the immediate future

10

will depend on the Rand/Dollar exchange rate." (Id. ¶ 60.) Later in the Class Period, as a March 15, 2004 press release notes, DRD was appointing a "stakeholder task team to help fight [the] impact of rand strength on [operating] margins." (CAC ¶ 75.)

Thus, DRD argues that there is nothing actionable about its statements regarding the restructuring at the NWO when those statements are analyzed in their proper context. See Halperin v. eBanker USA.com, Inc., 295 F. 3d 352, 357 (2d Cir. 2002)("allegedly fraudulent materials [are viewed] in their entirety to determine whether a reasonable investor would have been mislead. The touchstone of the inquiry is . . . whether defendants' representations or omissions, considered together and in context, would affect the total mix of information . . ."). DRD asserts that because it "provided its investors exposure to the upside benefit of gold price appreciation and/or Rand depreciation, it also exposed them to the risk of gold price depreciation and/or Rand appreciation. In short, investors understood that DRD had positioned itself as a pure play on the price of gold." (Defendant DRDGold Limited's Motion to Dismiss Plaintiff's Consolidated Amended Class Action Complaint, dated May 30, 2006 ("DRDGold Br."), at 10.)

While DRD may be correct that investors understood the value of DRD stock to be closely tied to the price of gold and

Rand/Dollar exchange rate, this fact does not make DRD's statements regarding the restructuring any less materially false or misleading if "there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976)). If in fact DRD knew but failed to disclose at the start of the Class Period that the NWO could not sustain a profit under any reasonably foreseeable circumstances, because the NWO was a significant DRD asset, the Court cannot say that the reasonable investor would not view this information as altering the "total mix."

DRD also asserts that any optimistic statements regarding the restructuring and related "strong balance sheet" are statements of opinion and puffery and therefore not actionable as a matter of law. See Rombach, 355 F.3d at 174 (a company is "not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of business that they manage."); City of Sterling Heights Police and Fire Retirement System v. Abbey national, PLC, 423 F. Supp. 2d 348, 358 (S.D.N.Y. 2006) (statements in SEC filings such as "Wholesale Banking is in very good shape

12

as it moves into its next stage of development," found to be "inactionable as general statements of optimism").

The statements cited by Plaintiffs in the CAC as material misrepresentations concerning the "sustainability" of the NWO restructuring and DRD's related "strong balance sheet" appear to be more properly characterized as optimistic statements of opinion as opposed to fact.  However, opinion statements are actionable if Plaintiffs can plead "with particularity that defendants did not sincerely believe the opinion they purported to hold." Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004).

Here, Plaintiffs assert that DRD's statements regarding the restructuring are actionable because they were not "consistent with reasonably available data." In re Livent, Inc. Sec. Litig., 148 F. Supp. 2d 331, 350 (S.D.N.Y. 2001). As asserted in the CAC, DRD knew at the beginning of the Class Period, based on its knowledge of fixed costs and antiquated infrastructure at the NWO, that sustaining a profit was simply not possible.  Thus, Plaintiffs assert that DRD's statements presenting an optimistic outlook, whether characterized as fact or opinion, were knowingly false.

In analyzing whether DRD's statements regarding the "sustainability" of the NWO and DRD's "strong balance sheet" were not sincerely held opinions and thus actionable

misrepresentations, the "material misrepresentation"
requirement for pleading fraud essentially collapses into the
scienter requirement.  As the court explained in <u>Podany</u>,

> [A] material misstatement of <u>fact</u> is alleged by pointing
> to the true fact about the world that contradicts the
> misstatement.  But even if the statement of fact ("the
> company made x million dollars in profit last year")
> turns out to be objectively false, it could have been
> made in good faith; subjective intent to commit fraud is
> a wholly separate inquiry from whether the statement is
> objectively true.  However, a material misstatement of
> <u>opinion</u> is by nature a false statement, not about the
> objective world, but about the defendant's own belief.
> Essentially, proving the falsity of the statement "I
> believe this investment is sound" is the same as proving
> scienter, since the statement (unlike a statement of
> fact) cannot be false at all unless the speaker is
> knowingly misstating his truly held opinion.

318 F. Supp. 2d at 154 (emphasis in original).

### 2.  <u>DRD's November 24, 2004 Restatement</u>

With respect to DRD's restatement of earnings,
misreported financial data are clearly false statements of
fact.  See <u>In re Atlas Air Worldwide Holdings, Inc. Sec. Lit.</u>,
324 F. Supp. 2d 474, 486-87 (S.D.N.Y. 2004) ("Although a
restatement is not an admission of wrongdoing, the mere fact
that financial results were restated is sufficient basis for
pleading that those statements were false when made.")
However, "allegations of GAAP violations or accounting
irregularities, standing alone, are insufficient to state a
securities fraud claim . . . Only where such allegations are
coupled with evidence of corresponding fraudulent intent might

14

they be deemed sufficient." <u>Novak v. Kasaks</u>, 216 F.3d 300, 309 (2d Cir. 2000)(internal citations omitted). Whether the alleged misrepresentations in the CAC sufficiently form the basis for a securities fraud cause of action is dependent on whether Plaintiffs' allegations are sufficient to support an inference of the requisite fraudulent intent by Defendants.

B.  <u>SCIENTER</u>

The PSLRA requires that the complaint allege sufficient facts to support a "strong inference" of the requisite state of mind.  15 U.S.C. § 78u-4(b)(2).  A plaintiff can fulfill this scienter requirement through one of two methods: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138-39 (2d Cir. 2001) (quotation marks and internal citations omitted).

1. <u>Motive and Opportunity</u>

In order to support a "strong inference" of fraudulent intent, Plaintiffs' allegations of motive must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." <u>Id.</u> at 138-139 (internal citations omitted).  Motives that can be ascribed to "virtually all corporate insiders," or "any

15

publicly owned, for profit endeavor" are not sufficient to support a claim of fraud.  Id.; Chill v. General Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996).

Here, Plaintiffs' pleadings as to motive are rather weak.[5] Plaintiffs point to Wellesley-Wood's June 2004 sale of approximately 20 percent of his DRD stock as supporting a strong inference of scienter.  Generally, however, a significant stock sale by just one corporate insider is insufficient to support such an inference.  See San Leonardo Emergency Medical Group Profit Sharing Plan v. Phillip Morris Co., 75 F.3d 801, 814 (2d Cir. 1996) ("[W]e conclude that the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent."); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("[T]he sale of stock by one outside director does not give rise to a strong inference of an intent to deceive the investing public.").  Significantly, the CAC makes no specific allegations of other insiders, including defendant CEO-CFO Murray, selling stock during the class period.  cf. In re eSpeed, Inc. Sec. Lit., 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006)("[T]he dispositive factor [undercutting motive allegation] is that other insiders, including two other

---

[5] Defendants do not contest that they had the "opportunity" to commit fraud.

individual defendants, did not sell during the putative class period."). Moreover, the CAC does not indicate what profit, if any, Wellesley-Wood made from this sale. See In Re Scholastic Corp. Sec. Lit., 252 F.3d 63, 75 (2d Cir. 2001) ("Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales. . . ."). The generalized allegation in the CAC that other insiders sold stock before bad news was released lacks the necessary specificity as to who was involved in the transactions, when and in what amounts, for this Court to give the assertion any weight.

Additionally, Plaintiffs cannot support an inference of scienter by alleging that Defendants were motivated to engage in the alleged fraud in order to inflate the price of DRD's stock, maintain the appearance of profitability or raise capital. See Novak, 216 F.3d at 307 ("Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders, including: (1) the desire to maintain a high corporate rating, or otherwise sustain the appearance of corporate profitability, or of the success of an investment.") (internal citations and quotations omitted); San Leonardo, 75 F.3d at 814 (company's desire to maintain high bond or credit rating does not qualify as a sufficient motive for fraud); Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1414

17

(S.D.N.Y. 1996) ("It is not sufficient, however, to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising additional capital."); Leventhal v. Tow, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) ("[T]he complaint alleges that defendants had a motive to inflate Citizens' stock price during the class period in order to get more favorable terms in the stock-for-stock transactions and in the issuance of the debentures.  This motive is also insufficient to establish scienter and is routinely rejected by the courts.").

However, Plaintiffs specifically allege that Defendants misrepresented the status of the NWO in order to keep the stock price high so that the company could use the inflated stock price as capital for acquiring additional mines.[6]  The Second Circuit has ruled that "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." Rothman, 220 F.3d at 93 (citing In re Time Warner Sec. Lit., 9 F.3d 259, 270 (2d Cir. 1993).  Here, however, as asserted in

---

[6]  From December 2002 to July 2004, DRD acquired a 45 percent interest in an Australian listed gold mining company in Fiji (CAC ¶¶ 49-52); on October 14, 2003, DRD acquired an interest in mines in Papua New Guinea purchased in part with DRD's ordinary shares (Id. ¶ 54); and on April 24, 2004 DRD acquired a 50 percent interest in Net-Gold Services, a company that brokers the payment of purchases made by subscribers, through settlement in gold (Id. ¶ 55).

Plaintiffs' brief, "DRD's artificially inflated stock price facilitated Defendants' attempts to diversify away from its nearly total dependence on the failing NWO." (Lead Plaintiffs' Memorandum of Law in Opposition to DRDGold Limited's Motion to Dismiss the Consolidated Amended Class Action Complaint, dated July 31, 2006 ("Opp. Br."), at 20.) Plaintiffs fail to identify how such a motive evidences fraud against DRD shareholders. If anything, it evinces what ordinarily would be a laudable desire to diversify in order to protect shareholder investments from complete dependency on the company's economically challenged NWO. The assertion that DRD sought to keep its share price elevated so that it could complete transactions on more favorable terms "does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because the shareholders themselves would benefit from a superior transaction." Kalnit, 264 F. 3d at 140-41 (a generalized desire "to achieve the most lucrative acquisition proposal" not sufficient to establish scienter).

　　2. Conscious Misbehavior or Recklessness

　　To prove scienter through conscious misbehavior or recklessness, a plaintiff must alleged conduct which at a minimum, "is highly unreasonable and [] represents an extreme departure from the standards of ordinary care to the extent

that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (internal citations omitted).

       a. <u>NWO Restructuring Statements</u>

Plaintiffs assert that Defendants knew or were reckless in not knowing that the NWO restructuring could not possibly succeed. The specific facts alleged in support of this allegation are that DRD used specific metrics and formulas to analyze the profitability of its mines and that these metrics, such as the "tonnage gradecurve" (CAC ¶ 35), allowed DRD to calculate whether the mine could be profitable, based upon currency and price of gold fluctuations. Additionally, Defendants allegedly used a "pay limit" (<u>Id.</u> ¶ 36) calculation to determine how many workers it could employ and make a profit at the NWO, and that Defendants were aware the NWO's restructuring would not result in a "pay limit" that would have enabled the NWO to operate economically. Based on information from confidential witnesses, the CAC alleges that Defendants were aware the mines were operating below expectations. The confidential witnesses is also quoted as stating there were "many undisclosed illegalities." (CAC ¶ 40).

The Court is not persuaded that these ambiguous and

conclusory allegations provide the necessary particularity to meet the heightened pleading requirements of Rule 9(b) and the PSLRA.   First, with respect to the "many undisclosed illegalities," Plaintiffs do not give any further specifics regarding the sum and substance of these "illegalities" that would raise a strong inference of fraud.   Such an unsubstantiated allegation clearly lacks the necessary particularity to support a securities fraud claim.

As for the pleadings regarding the specific formulas and metrics that Defendants used to determine mine profitability, Plaintiffs have essentially employed a "pleading technique that couples a factual statement with a conclusory allegation of fraudulent intent" in an attempt to create a strong inference of scienter. Rombach, 355 F.3d at 176.  In essence, the CAC alleges that Defendants were able to accurately analyze mine profitability and therefore must have known or recklessly disregarded the fact that the NWO restructuring could not succeed.  Significantly, the CAC fails to reference any actual reports reviewed by any specific individuals at DRD on any specific dates that indicated the NWO restructuring could not succeed.   See Novak, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); San Leonardo, 75 F.3d at 812

21

("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss.").

The Second Circuit has found fraudulent intent to be sufficiently alleged where defendants failed to timely disclose material data which resulted in misrepresentations of the defendant companies' current finances where it was clearly pled that the defendants knew or should have known better. See Novak, 216 F.3d at 311 (the defendants were aware they were holding onto worthless inventory, discussed the need to mark down the inventory but chose not to out of fear of damaging the company's financial prospects); Rothman, 220 F.3d at 90 (finding recklessness where plaintiffs allegations "turn[ed] not on [defendant's] overly optimistic predictions of sales before the fact, but on its failure to expense royalty advances after poor sales during the Class Period were known.")(emphasis in original); Scholastic Corp., 252 F.3d at 76-77 ("Defendants publicly represented that returns were not increasing and failed to adjust revenues despite their knowledge of rapidly rising returns."). Here, a strong inference of recklessness in not warranted with respect to DRD's statements regarding the restructuring of the NWO as the CAC contains no allegations that DRD failed to disclose any

22

actual data which would have changed a reasonable investor's understanding of DRD's underline current financial situation relating to the restructuring.

The allegations regarding the restructuring in the CAC are similar to those found insufficient to support an inference of scienter in Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994). In that case the compliant alleged that the defendant "knew or should have known that Citytrust's loan problems had worsened materially and were worsening and that it was highly likely, if not certain, that Citytrust would soon again greatly increase its loan loss reserves." Id. at 1129 (emphasis added). Similarly, here the Plaintiffs argue that "Defendants knew, or were reckless in not knowing, that it was highly unlikely -- if not impossible -- for the restructuring of the NWO to be successful due to economic realities and the impairment of the NWO." (Opp. Br. at 15 (emphasis added.)) As in Shields, "[t]he pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud." 25 F.3d at 1129.

The NWO was a key DRD asset and a company that does everything it can in an effort to make that asset sustainable should not be charged with recklessness unless it clear the

endeavor could not possibly succeed.  That it was risky, imprudent or even negligent to attempt to sustain the NWO during the Class Period does not equal recklessness. See In re JPMorgan Chase Sec. Lit., 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) ("Recklessness in the scienter context cannot be merely enhanced negligence."); Livent, 148 F. Supp. 2d at 351 ("Congress manifested a purpose to draw the line at knowing, intentional or extreme behavior, and to distinguish fraudulent actions from lesser wrongs. . . . Congress did not intend the prohibition of § 10(b) to encompass alleged violations that constitute mere negligence.").

   b.  November 29, 2004 Restatement

   The only actual misstatements of DRD's current finances were those disclosed in the company's November 29, 2004 restatement.  These accounting errors, however, do not support a strong inference of fraudulent intent.  Significantly, the restatement "did not result in a restatement or revision to [DRD's] financial results for fiscal 2004 as a whole." (CAC ¶ 109.)  The nature and magnitude of the restatement was not such that scienter can be stongly inferred. cf. In re Atlas Air, 324 F. Supp. 2d at 489 (where as a result of restatement, company was "transformed from a company with retained earnings of approximately $185 million to a company with an accumulated deficit of approximately $178 million," "the size

and nature of the restatement suggest that this was no mere error caused by hyper-technical accounting rules"); <u>Lewin v. Lipper Convertibles, L.P.</u>, No. 03-CV-1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) ("[T]he accounting violations alleged are on such a repeated and pervasive scale that, if proven, they could provide strong circumstantial evidence of scienter.").

Plaintiffs fail to create a strong inference that the misreported data was issued in conscious or reckless furtherance of any alleged fraudulent scheme.  While the misreported financial information which led to the restatement "may have been caused by intentional fraud or recklessness, they could well be the products of negligence or mismanagement." <u>In re Bisys Sec. Litig.</u>, 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005).  Here, Defendants provide a plausible, non-fraudulent explanation for the errors that lead to the misstatement.  DRD acknowledged, as the CAC itself recites, that the company had "experienced difficulties in finding internal personnel and external advisors in South Africa with sufficient US GAAP experience." (CAC ¶ 149.)  While DRD acknowledged that the weakness that lead to the accounting errors existed as early as 1996, they were effectively mitigated through fiscal 2002 by employment of external accounting advisors with U.S. GAAP expertise.  (<u>Id.</u> ¶ 151.)

The company did not use these external accounting advisors for the preparation of quarterly U.S. GAAP reports, which DRD did not begin issuing until the second quarter of 2003. (Id.)  It is not at all implausible that the accounting errors in DRD's quarterly reports that led to DRD's restatement were of the type likely to result from the simple negligence of inexperienced accounting personnel, rather than from fraud.

Plaintiffs argue that the admitted shortcomings in DRD's internal controls evidence more than simple negligence. However, while a "complete lack of internal controls" can constitute evidence of recklessness, cf. In re Oxford Health Plans, Inc. Sec. Litig., 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999), the deficiencies alleged in the CAC do not rise to that level.

With respect to the accelerated depreciation charge taken for Shaft 6, while it did result in an overstatement of operating results for the first quarter of fiscal year 2004 which was then reversed in the third fiscal quarter of 2004, Plaintiffs allege no facts from which it may be reasonably inferred that this accelerated depreciation was recklessly taken for the purpose of inflating DRD's quarterly revenue for the NWO.  As DRD explained in its public filings, the depreciation was taken because "the expectation at the time was that the shaft would not be utilized in the future." (CAC

¶ 119.)  When DRD shortly thereafter determined that "limited high grade mining into some of the remaining pillars was financially viable," DRD decided to bring the mine back into production. (Id.)  In order to draw a strong inference of scienter, the Court would have to infer that DRD knew or recklessly disregarded that at the time it decided to make the depreciation the company was aware, or should have been aware, that Shaft 6 would go back into production.  Plaintiffs make no allegations to allow for such an inference.

Regarding DRD's failure to properly recognize losses associated with loans to CGR on a quarterly basis, the CAC attempts to support an inference of recklessness relating to this accounting error by emphasizing that DRD principals had previously acknowledged that DRD would account for its interest in CGR using the "equity method."  As DRD explained in its 2003 financial statements, "[i]nvestments in associated undertakings are accounted for by the equity method of accounting.  These are undertakings over which the Group has the ability to exercise significant influence, but which it does not control." (CAC ¶ 114.)  Plaintiffs assert that after using the equity method to account for its 40 percent interest in CGR in fiscal year 2003, "DRD inexplicably ceased using the equity method to account for CGR in fiscal 2004, which, not coincidentally, materially overstated the Company's reported

interim 2004 operating results." (Id. ¶ 116.)  However, DRD's
restatement does not indicate that it ceased accounting for
its interest in CGR using the equity method in fiscal year
2004.  It simply acknowledges that "[u]nder US GAAP, [DRD's]
portion of the losses recorded by [its] associate, CGR, should
have been recognized against the advances, forming part of
[its] investment, in the respective quarters in which the
losses are recorded." (Id. ¶ 117.)  It is not clear from the
CAC that in fiscal year 2003 DRD recorded impairment of its
loans in quarterly statements, and then inexplicably stopped
this practice in its fiscal year 2004 quarterly statements.
If this change were explicitly alleged, it might support an
inference of recklessness as the failure to quarterly report
these losses allowed DRD to overstate its operating results
for the first three quarters of fiscal year 2004. See In re
Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 231
(S.D.N.Y. 2006) (actions which are "contrary to express policy
and prior practice, form the basis for proof of
recklessness.") (internal citations omitted).  However, as it
is unclear from in the CAC, and as the parties do not directly
address this issue in their briefs, as the CAC now reads, the
Court cannot infer recklessness from DRD's failure to report
these impairments in its quarterly statements in light of, as
discussed above, DRD's having just begun issuing quarterly

statements under U.S. GAAP and issuing them without the assistance of external accounting experts.

Finally, Plaintiffs also assert that at the end of the Class Period, "Doug Campbell, DRD's Senior Independent Non-Executive Director, responsible for leading the evaluation of defendant Wellesly-Wood's performance, resigned after being in the position just three weeks." (CAC ¶ 142.)  However, the CAC does not state any facts to indicate that his departure was a result of any knowledge of alleged fraudulent activities at DRD.   See In Re Bisys, 397 F. Supp. 2d at 446 (where plaintiffs "alleged no facts linking the resignation . . . to the accounting improprieties at Bisys," "the resignation could not support an inference of conscious misbehavior or recklessness").

To the extent Plaintiffs seek "to combine inadequate allegations of motive with inadequate allegations of recklessness," such an approach is not an acceptable way in which to allege scienter.  Kalnit, 264 F.3d 141; see also In Re Bisys, 397 F. Supp. 2d at 449 ("Nor do plaintiffs save their claims from dismissal by arguing that their various allegations of motive and opportunity and conscious misbehavior or recklessness -- though insufficient when considered in isolation -- are somehow adequate when considered together.")

C.   <u>CAUSATION</u>

Finally, to state a claim for securities fraud, a plaintiff must plead both transaction causation and loss causation. <u>See</u> <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 172 (2d Cir. 2005). Transaction causation requires a showing that the plaintiff "relied upon defendant's allegedly fraudulent conduct in purchasing or selling securities," while loss causation is pled through facts alleging "that defendant's conduct caused, at least in part, plaintiff's loss." <u>In re GeoPharma, Inc. Sec. Litig.</u>, No. 04 Civ. 9463, 2005 WL 2431518, at *6, n. 86 (S.D.N.Y., Sept. 30, 2005). As the Second Circuit explained <u>Lentell</u>, a plaintiff must allege that "the loss be foreseeable and that the loss be caused by the materialization of the concealed risk." 396 F. 3d at 173.

Leaving aside for the moment Plaintiffs' failure to adequately allege scienter, Plaintiffs' loss causation allegations sufficiently "provide defendant with some indication of the loss and the causal connection that the plaintiff has in mind." <u>Dura</u>, 544 U.S. at 347. DRD argues that Plaintiffs cannot prove loss causation because the alleged misstatements cannot be causally linked to drops in DRD's stock price. First, DRD notes that its stock price actually rose following the announcement of its intent to restate earnings on November 24, 2004. However, DRD's stock

price declined by 12.5 percent over the next three days. DRD also notes that its initial announcement of its intent to take an impairment on the NWO on February 18, 2005 did not result in a stock price drop. The February 18, 2005 announcement, however, was simply that DRD intended to "take an impairment, not yet quantified, to the carrying value of the South African based mining assets." (CAC ¶ 99.) Following the February 24, 2005 announcement of DRD's intent to take a full impairment, the stock price did drop precipitously. Thus, Plaintiffs have alleged a causal connection between the alleged misstatements and drops in DRD's stock price.

Plaintiffs task is complicated, however, in light of DRD's pre-existing financial problems and its public disclosures regarding its vulnerability to currency and gold price fluctuations. Whether Plaintiffs can sufficiently prove that the alleged fraud is what caused DRD's stock price drop and not the openly disclosed challenges to the NWO's profitability, is a closer question. See Emergent Capital Investment Mngmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003) ("Of course, if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established."). If "substantial indicia of the risk that materialized are unambiguously apparent on the face of the

disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud -- rather than other salient factors -- that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment."  <u>Lentell</u>, 396 F.3d at 177.

Here, it does appear Plaintiffs have alleged sufficient facts to survive a motion to dismiss that the alleged misstatements of Defendants were the proximate cause of their losses.  Whether it was in fact other openly disclosed risks that caused the drop in price in the stock is "a matter for proof at trail and not to be decided on a 12(b)(6) motion to dismiss."  <u>Emergent</u>, 343 F. 3d at 197.

D.  <u>LEAVE TO REPLEAD</u>

Plaintiffs request leave to address any pleading deficiencies in an amended complaint, in the event the Court finds the CAC deficient.  Leave to replead "shall be freely given when justice so requires."  <u>See</u> Fed. R. Civ. P. 15(a).  Moreover, "Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)."  <u>Acito</u>, 47 F. 3d at 55.  Whether to grant such leave is within the "sound discretion of the district court."  <u>Id.</u>

Here, Plaintiffs should not be denied the opportunity to

replead.    Whether  or  not  the  Plaintiffs  can  cure  the
deficiencies in the CAC remains to be seen, but because the
Court bases its dismissal of the CAC primarily on Plaintiffs
failure to allege facts in support of its charge of fraud with
sufficient    particularity,    leave    to    replead    is    not
inappropriate. See  In  re  IPO, 241  F.  Supp.  2d  at  399
("Plaintiffs may replead, however, claims that have been
dismissed for lack of the required particularity.")

## VI.   ORDER

For the foregoing reasons, it is thereby

**ORDERED**  that  defendant  DRDGold  Limited's  motion  to
dismiss the Consolidated Amended Complaint (Docket No. 26 ) is
hereby GRANTED; and it is further

**ORDERED** that leave to replead is granted and Plaintiffs
shall file an amended Complaint within thirty (30) days of the
date of this Order.

**SO ORDERED**.

Dated:    New York, New York
          31 January 2007

                              Victor Marrero
                              U.S.D.J.

33